## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| DONTAE THOMAS, | Civil No. 12-2272 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| TYRONE BARZE, JR., VICTOR MILLS and CITY OF MINNEAPOLIS, | |
| Defendants. | |

---

Robert Bennett, Brett M. Burns, and Andrew J. Noel, **GASKINS, BENNETT, BIRRELL, SCHUPP, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402, for plaintiffs.

Andrea Kloehn Naef, Brian Scott Carter, Tracey N. Fussy, Assistant City Attorneys, **MINNEAPOLIS CITY ATTORNEY'S OFFICE**, 350 South Fifth Street, Room 210, Minneapolis, MN 55415, for defendants.

Plaintiff Dontae Thomas was a senior at Patrick Henry High School in Minneapolis when, after lunch in January 2012, he was asked to meet with two school police officers, Defendants Tyrone Barze and Victor Mills. According to Thomas, during this meeting in an inner office in the special education wing, Barze put him in a choke hold and knocked him out. He brings this action under 42 U.S.C. § 1983 against Barze, Mills, and the City of Minneapolis ("the City"), bringing claims for unreasonable seizure, false arrest, and excessive force against Barze and Mills and a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), against the City. Defendants move for partial summary judgment on all of Thomas' claims except the excessive force claim against

Barze, asking the Court to dismiss the false arrest and unreasonable seizure claims against Barze, all counts against Mills, and the *Monell* claim against the City. Thomas moves to exclude Defendants' expert witness, Joshua Lego on the grounds that Lego's report is based on Defendants' version of events, includes improper legal conclusions, and includes medical opinions beyond the scope of Lego's expertise as a police trainer on the use of force.

The Court will deny Defendants' summary judgment with regard to the unreasonable seizure claim against Barze and Mills and the excessive force claim against Mills. The Court concludes that, taking the facts in a light most favorable to Thomas, a reasonable jury could find that Mills and Barze did not have a reasonable basis to require Thomas to meet with them in the office and that Mills encouraged Barze in using the choke hold, or at least was required to intervene to stop him but failed to do so. The Court also concludes that Barze and Mills are not entitled to qualified immunity against these claims. Thomas has indicated that he is willing to voluntarily dismiss his *Monell* claim against the City, so the Court will deny as moot Defendants' motion with regard to that claim and instead dismiss it without prejudice. The Court will also grant Thomas' motion to strike Lego's expert report, but will permit Defendants to file another report within fourteen days, so long as that report does not contain any new opinions by Lego and omits the portions that the Court, as it explains below, deems problematic.

## BACKGROUND

### I.    PARTIES

Plaintiff Dontae Thomas was a student at Patrick Henry High School ("Patrick Henry") in Minneapolis in the Special Programming for Adolescent Needs ("SPAN program"), a special education program for students with behavioral needs. (Aff. of Andrea K. Naef, Ex. 2 (Dep. of Lauren Schmitz ("Schmitz Dep.")) 9, 11, Jan. 15, 2014, Docket No. 24.) At the time of his deposition, Thomas was 19 years old and had finished twelfth grade, but because he did not yet have enough credits to graduate he moved on to a different program called "Transitions Plus," where he finished his credits. (Naef Aff., Ex. 7 (Dep. of Dontae Thomas ("Thomas Dep.")) 8, 30.) Before attending Patrick Henry, Thomas changed schools very frequently, moving between Minneapolis, Bloomington, Otsego, and Arizona, depending on where his parents were and moving between his mother and father's homes. (Thomas Dep. 8-25.)

The SPAN program began as a separate school in 2003 at a middle school and expanded to a separate high school in 2004. (Schmitz Dep. 9.) The program coordinator for SPAN at Patrick Henry, Lauren Schmitz, testified that SPAN students tend to have "emotional or behavioral needs," such as "issues with compliance," a hard time regulating their emotions, ADHD, or other behavioral needs. (*Id.* at 56.) Thomas began in the program in ninth grade. (*Id.* at 11.) Schmitz reported that she "didn't really have any problems with him," and had never felt physically threatened by him. (*Id.* at 13-15.) Schmitz said "the biggest issue that we would work on is compliance and following staff requests on the first request;" she did not remember him having been in any fights before

or having threatened other people.  (*Id.* at 59; *see also id.* at 63 ("I can't recall a time that he threatened someone.").)  When asked about Thomas, John Swain, the head of building security for Patrick Henry High School said that he had had only a few negative incidents, mostly in terms of "pull your pants up," "be respectful, watch your language . . . [t]here was a couple of times I could just remember him kind of going off . . . but . . . I've seen way worse than him."  (Naef Aff., Ex. 4 (Dep. of John Swain ("Swain Dep.")) 9, 65.)

Defendant Victor Mills is a School Resource Officer ("SRO") for Patrick Henry. (Schmitz Dep. 6, 17-18.)  The School Resource Officer program is managed through a partnership between Minneapolis Police Department and Minneapolis Public Schools, and managed through the district's security office, whereas the "part-time officers who are hired by the schools, specifically to supplement security function, are hired directly through the schools without any connection to our office."  (Naef Aff., Ex. 3 (Dep. of Jason Matlock ("Matlock Dep.")) 75.)  Defendant Barze is a part-time officer that works lunch duty at Patrick Henry High School.  (Schmitz Dep. 41.)  Unlike Mills, Officer Barze was not hired by the District's security program, but rather the high school itself. (Matlock Dep. 12.)  Officer Barze was a part-time officer hired by Patrick Henry off-duty to provide extra security coverage; he was not hired by the District's security program, but rather the high school itself.  (*Id.*)  A district official testified about how the school navigates the line between criminal and non-criminal interactions between officers and students:

[W]ith a school resource officer, if it's a non-criminal case, that there's not a belief that it's going to be a criminal investigation, then we are very open to how they want to interact with the students.

Had there been a situation where they felt this was moving to a criminal matter, we would have asked . . . we ask at that point that school staff notify a parent that there's a criminal, ongoing criminal piece going on.

That's . . . sort of where we draw that line between what is good mentoring or good interaction and what the police are doing as police officers."

(*Id.* at 88.)


## II.     EVENTS OF JANUARY 12, 2012

The dispute in this case centers on events that occurred during and shortly after lunch at Patrick Henry on January 12, 2012.  The events involved in the incident subject to this suit generally proceeded as follows: Thomas was at lunch with his peers and, at the end of lunch, the head of school security sent Barze and Mills to monitor his table. Mills and Barze apparently heard Thomas and his friend mutter comments at them, so after lunch they asked Thomas' special education program teacher, Schmitz, to use her office for them to meet with Thomas privately after lunch.  Mills and Barze met with Thomas' friend Denzel Davis in Schmitz's office with the door closed, and then also met with Thomas in her office with the door closed, which ultimately resulted in Barze putting Thomas in a neck restraint.  Thomas left the office crying and went home, after which his father and stepmother took him to the emergency room.

The Court will recount the various accounts of the entire incident according to the deposition testimonies of the various parties and witnesses in this case.  The record also

includes Barze's write-up of the event, (Naef Aff., Ex. 9), the complete Minneapolis Police Department reports, (Aff. of Andrew J. Noel, Ex. 2, Feb. 5, 2014, Docket No. 31), and a video of the lunchroom activities on January 12, 2012 (Noel Aff., Ex. 1.)  The most relevant contents of these documents are discussed in much of the deposition testimony.

### A.      Lunchroom

When counsel for Defendants asked Thomas to tell the story of the incident on January 12, 2012, he began: "Well we was in the lunchroom, and it was four of us at that table. . . . [A]nd everybody was being loud at the table . . . [n]ormal loud, every day lunch. . . . And I recall Mills was coming up, he said something, I can't really remember what he said."  (Thomas Dep. 70.)  He stated that Barze then approached, and according to Thomas, said, "we ain't going to be having all of that today. . . . And he said, 'I'm gonna lay one of you niggers down, I'm going to lay one of you niggers down.' . . . [A]nd then he walked back off, then we had some more words with Mills."  (*Id.* at 71.)  Thomas could not really remember what words they had with Mills, but he remembered himself "saying to him like he wouldn't be doing all of that, all of that without the badge."  (*Id.* at 71.)  And then he and Mills had more words: Mills "said something like 'We can go outside' or something," he didn't really recall.  (*Id.* at 72.)  He thought this meant going outside to fight or something, and then the bell rang and they all left and he went upstairs.  (*Id.* at 73.)  Then Thomas recalled, "I think Lauren Schmitz said we can't go back to class until we talk to Officer Barze. . . .  I was assuming [they wanted to talk to us] from the lunchroom, from the words we had in the lunchroom."  (*Id.* at 73.)  He said that he

thought the officers felt they needed to talk to him because of "us being disrespectful of them or whatever." (*Id.* at 74.)  Thomas said that other kids were saying stuff to the officers but that he was not really paying attention. (*Id.* at 74.)  He said he thought the officers came over to them because they were being loud, but he said he was not doing any play fighting: "[t]here might have been some students doing play fighting, but I was just talking to Denzel [Davis]." (*Id.* at 75.)  He denied talking to any Hmong students during lunch that day. (*Id.* at 79.)[1]

Defendant Mills testified, with regard to the events in the lunchroom, that the head of school security, John Swain, initially brought it to his and Barze's attention "to come over and stand by [Thomas' table] because he felt that the kids were getting out of control," but he acknowledged that Swain did not say anything about Thomas making threats toward officers. (Naef Aff., Ex. 5 (Dep. of Victor Mills ("Mills Dep.")) 10-11.)  When asked what threats Thomas made toward a police or officers, he said:

> Well, one thing, when he was walking up to his classroom, he could have just took like 50 steps, but they took the long way.  And as they were walking down the hallway, they started talking about how they're going to get they gats and shoot the police, and how they're going to shoot the Hmong students.  You know, how they're going to assault someone.  And, you know, I believed that, because there have been assaults at the school. There had been assaults between the Hmongs and the black students.

(*Id.* at 11.)  He said that it was a group of maybe ten to twelve SPAN students that were "yelling and hollering" at this point. (*Id.*)  He said that "it may or may not be in the

---

[1] As discussed further below, part of Defendants' explanation for seeking to talk with Thomas after lunch that day was to preempt what they perceived to be potential violence between black students and Hmong students at Patrick Henry.

report, but I felt threatened by Dontae Thomas," although acknowledged that he did not find anything in his report about a threat made by Thomas to police officers. (*Id.* at 12.) He said that it happened even though it was not in the report. (*Id.* at 13.) He explained his motivation for talking to Davis and Thomas: "I was going to try to talk to [Thomas] and Mr. Davis, try to explain to them why we're doing what we're doing, why the school doesn't want brawls in their school, why we can't have this violence, and why we can't have these threats." (*Id.* at 15.)

Barze testified that on January 12, 2012, "[w]hile in the lunchroom, I was called over to stand near a set of tables because of some conduct. What I observed were students standing up, involved in what looked like maybe pushes or swings being made. . . . I was able to see a group of students that were involved. The actual individuals that were involved in that behavior, I don't know who they are by name nor by face," but he said that Thomas was in the group, although he could not "single him out directly knowing his behavior." (Naef Aff., Ex. 8 (Dep. of Tyrone Barze ("Barze Dep.")) 17-18.) He did not recall what Officer Mills' intentions were, but he was "called over, and [] stood by to show a presence, as a way to have them calm down and stop their behavior," which he acknowledges was not effective. (*Id.* at 20.) He said that the students then did not leave the lunchroom peacefully, but rather he "observed some of the students that were involved in what [he] described in [his] first paragraph in [his] supplement here, jumping up and down in the hallway yelling, speaking loudly, and throwing hand symbols up." (*Id.* at 21.) He did not remember if Thomas was in that group he observed. (*Id.* at 21.)

**B.      Request for Meeting After Lunch**

After the students had left the lunchroom, Mills and Barze sought to have a talk with Thomas and his friend Denzel Davis.  Lauren Schmitz testified that on January 12, 2012, Mills "stopped me in the hallway after lunch and told me that he wanted to speak to some of the kids, two of the students that had been causing problems in the lunchroom. . . . Something along the lines of that he wanted to talk to the two students in my office after lunch, because they had – I don't know exactly the words he used.  But that they had been disruptive in the lunchroom."  (Schmitz Dep. 15-17.)       She observed the two students walking away and mumbling, but did not remember Mills asking the students to come back or to go to the SPAN office.  (*Id.* at 18-19.)  Schmitz followed the students and asked them to come back; Davis came back but Thomas kept walking, so she called after him to come back again and he did.  (*Id.* at 19-20.)  At this point, neither Mills nor Barze had told her that either Davis or Thomas had threatened a police officer.  (*Id.* at 20.)  She left to go help a teacher with a different student and left Thomas sitting outside the office.  (*Id.* at 21.)

Thomas testified that once he got upstairs after lunch, Lauren Schmitz told him that he could not "go to class until [he talked] to the officers [in] private."  (Thomas Dep. 79.)  He walked off and went to the third floor "[b]ecause I didn't want to be in the hallway and talk to somebody, probably talk to some girls, somebody."  (*Id.* at 80.)  He said at that point he did not know where the officer was, he thought they were still in the lunchroom.  (*Id.* at 80.)  He went back downstairs and his teacher told him he could not

go to class until he talked to someone.  (*Id.* at 81.)  Then he said that he "walk[ed] out the class, and I was walking to the class. I see Denzel walking out.  He walk out of the office real quick with his hoodie up.  And I was wondering what was going on.  And he left . . . straight out the school."  (*Id.* at 82.)  Thomas thought Denzel "must have talked to them while I was upstairs."  (*Id.* at 83.)

Emily Renner works in Patrick Henry's SPAN program as an associate educator and her desk is in SPAN's main office.  (Naef Aff., Ex. 6 (Dep. of Emily Renner ("Renner Dep.")) 9-10.)  On the day of the incident she was sitting at her desk in the main SPAN office working, "it was around lunchtime . . . .  And then they, Denzel and Dontae and the two officers, came in the office.  And I don't remember if Lauren was with them or not . . . . And then they asked . . . Denzel went into the office first . . . . I'm not sure if they asked him or if he just walked – walked in there."  (*Id.* at 32-33.)  She testified that Thomas stayed in the main office and "was pacing back and forth between the two doors."  (*Id.* at 34.)  When she was sitting at her desk she could see through the window into part of the inner office where the officers had taken Davis.  She said "it looked like one of the officers was searching [Davis]," but she does not remember seeing anything else.  (*Id.* at 36-37.)

## C.   Thomas' Meeting in Schmitz's Office

After Denzel Davis met with the officers, Mills and Barze brought Thomas into Schmitz's office in the SPAN office.  Renner testified that while Davis was in the inner office with the officers, Thomas was outside in the main office, and he "never wants to be

in the office," but it was Renner's understanding that he could not leave until the police officers talked to him.  (*Id.* at 38.)  After Davis left the inner office, she saw Thomas go into the office.  (*Id.* at 39-40.)  She "couldn't really hear what the officers were saying.  I could hear – I could hear Dontae, because he was speaking louder, he was yelling."  (*Id.* at 41.)  She does not remember what he said, but "he was swearing."  (*Id.*)  She answered affirmatively to recalling statements from an email she sent immediately after the event in which she said that Thomas sat in the chair and refused to follow the officer's direction to stand up, and that he refused to be searched.  (*Id.* at 41-42.)  She said she "remember[ed] him sitting – in [Schmitz]'s chair, all the way back, with his arms crossed."  (*Id.* at 42.)  She did not recall the exact timeframe, but she "heard what she assumed was [Schmitz]'s chair hit[ting] her desk.  And I looked up, and then I saw Dontae posturing at the police. . . . He was out of the chair and he was . . . standing in front of the police and he was really close to them, and he had his chest puffed up."  (*Id.* at 43-44.)  "[T]he next thing I remember is one of the officers had him in a neck restraint."  (*Id.* at 44.)  After it appeared that Barze and Thomas fell to the floor, she heard one of the officers say something along the lines of "night, night," or "goodnight, goodnight," but she could not determine who said it.  (*Id.* at 50.)  This disturbed her "[b]ecause it didn't sound like it was . . . necessary. . . . I think it was more of a taunting to Dontae."  (*Id.* at 50-51.)  Before their meeting was over, she "got up and left after the physical altercation and told – or while it was going on, and told the – I think I talked to Dara Ceaser.  She's the school social worker for – SPAN."  (*Id.* at 40.)  She told Ceaser that she "thought that they were choking [Thomas] out."  (*Id.* at 56.)

Thomas testified that he went into Schmitz's office in the SPAN office knowing that he would be meeting with the officers.  (Thomas Dep. 83-84.)   According to Thomas, Mills and Barze told him to sit down, and "I got my hat in my hand, and [Barze] tell me to put my hat down. . . . And then I had my hand on my hat, and I didn't move it quick enough, so he snatched it out of my hand.  Then he was talking to me, he told me to look him in the eye.  I wasn't looking in his eye, I was blowing him off . . . [b]cause I didn't want to be in there from the beginning." (*Id.* at 84-85.) He explained "I'm looking out of the – like blowing him off, kind of. . . . So then he came from behind me and smashed me up and put me in like the choke hold," apparently while he was sitting down. (*Id.* at 85.)  He said after the choke hold, Barze lifted him out of the chair, "like [to] raise me up." (*Id.*)  Thomas said, "I couldn't breathe . . . . I was panicking . . . . He was under my chin." (*Id.* at 91.)  "He lifted me out of the chair, and I'm struggling to get out of the hold.  And I'm like knocking down a box or something." (*Id.* at 92.)  After he knocked several things down from kicking and swinging his arms, he heard Mills say, "[P]ut him to sleep," right about when he knocked the box over. (*Id.* at 94.)  "I heard . . . Mills say to put me to sleep, and then I blacked out." (*Id.* at 95.)  Thomas continued, "[a]nd I remember waking back up . . . [l]aying on the ground . . . stretched out . . . on my side, on my stomach on my side," and Barze and Mills were standing up a few feet from him. (*Id.* at 96-97.)  Once he came to, he said they helped him get back up and sat him in the chair, "[a]nd then Barze took his vest and put his gun down and asked me what I wanted to do now.  And I didn't say nothing.  Then he gave me a lecture about how he was from the hood. . . . . Barze . . . said well he's from the hood, and he did all the stuff I be doing and

stuff like that." (*Id.* at 98.)  Thomas said they did not say anything about fights in the cafeteria. (*Id.* at 99.)

Defendant Barze's testimony about the meeting is somewhat different.  Barze testified that when Thomas was in the SPAN office, Barze did not "see why he wouldn't have been" free to leave; that he could leave "[w]henever he decided to walk up and leave." (Barze Dep. 34.)  He acknowledged that "[t]here was a time period while he was in the chair that I did touch him . . . . Because I asked him to remove himself from the chair so that I [could] pat him . . . for weapons." (*Id.* at 34.)  He acknowledged that Thomas was not free to leave if there was a pat-down being done. (*Id.* at 34-35.)  He said that he "placed [Thomas] in an escort hold based on his behavior.  And all of my interactions with him was based on a threat that he made towards the officers, to assault them." (*Id.* at 41.)  He said that there was a shape in [Thomas'] pocket, a bulge, that he was worried about: "It's hard to remember exactly what it was.  It was an irregular shape that was a bulge that caused concern for me." (*Id.* at 46.)  He never found out what was in his pocket, although he believed it to be chapstick and a phone. (*Id.* at 41.)

Mills testified that he and Barze asked Lauren Schmitz if they could talk to Thomas, but that Thomas was free to leave at any time. (Mills Dep. 15-16.)  They told Thomas that because he was 18 he could go to jail, to which Thomas said he didn't care, and then Mills told him that he would not be able to handle jail because he could not even handle being in a program that was catered to him. (*Id.* at 21.)  Apparently on the basis of a bulge in Thomas' pocket, they tried to pat down Thomas, but he did not believe they

- 13 -

ever got him patted down until "after the incident." (*Id.* at 24.) It turned out that the thing in Thomas' pocket was chapstick. (*Id.* at 24.)

  With regard to the actual use of force, he said, "[m]an, this happened so fast. They were all up and down here pushing each other, bouncing around." (*Id.* at 33.) He said that he was in the room the whole time Barze and Thomas were struggling, but that he never intervened because he "felt that Barze had him, you know, under control at the time. It happened fast. It's a . . . small . . . it's hard for, you know, all of us to even be in that room, really." (*Id.* at 34.) When asked about Barze's testimony that at some point he felt he was losing the fight, Mills said, "I'd say they were – they were struggling. You know, who's a loser, who's a winner . . . I don't know about that. But was he struggling with him? Most definitely, yes." (*Id.* at 35.) At some point, when Mills saw Thomas slam Barze into the filing cabinet, Mills "started walking over towards them. And by that time [Barze] had him turned around and was placing a neck restraint on him." (*Id.* at 38.) After that, he was "yelling, you know, for Dontae to stop fighting. . . . Things are flying all over the room. And [I] said 'Stop fighting. Calm down,' and then they went to the ground." (*Id.* at 39.) He said he thought about physically assisting Officer Barze "when they were . . . going back and forth here, when they were wrestling right here . . . . I mean, this is just a few seconds." (*Id.* at 40.) But he did not assist Barze because he "[d]idn't feel it was necessary at that time." (*Id.* at 41.)

  Mills denies saying anything like "night night" or "goodnight," as reported by Renner and Thomas. (*Id.* at 41-42.) He testified that "Dontae used force on the officer . . . first. If Dontae wouldn't have used force on [Barze], he could have got up and

walked out at any time." (*Id.* at 61.) When asked who touched whom first in a non-assaultive manner, he said that Barze touched Thomas first. (*Id.* at 61.) He agreed that Barze was asking Thomas to stand up so he could pat him down but that Thomas would not, so Barze took Thomas' left arm to try to get him to stand up. (*Id.* at 63.) After that, Thomas "jumped out of his chair . . . the chair flew back and either he slipped, he tripped or something fell to the ground." (*Id.* at 64.) Then Thomas "started kicking and stuff. Started kicking the microwave, started kicking things." (*Id.* at 64.) When asked if he had to tell Officer Barze to stop using the neck restraint on Thomas, he said, "I don't know," (*id.* at 68-69), but then he recalled stating, as recited in his report, that once he could see that Thomas was giving up, that he said, "he's had enough. That's it." (*Id.* at 69.) He said that after everything happened, Officer Barze wanted to charge Thomas with assault on a police officer, but he suggested that he not do that. (*Id.* at 18.) When asked if Mills did anything to help Barze during the altercation, he said, "[n]ot that I recall, no." (Barze Dep. 50.)

### D.      After the Meeting

Thomas testified that after his meeting with Barze and Mills was over he went to his locker and grabbed his coat and Schmitz was walking behind him. (Thomas Dep. 100.) He walked to his grandma's and then his cousin's house, from where he called his dad and his dad picked him up. (*Id.*) He then went to the doctor to get checked out because he felt pain in his shoulder and neck and his face was "all broke out." (*Id.* at 101.) He said that the red dots on his face lasted about two weeks – "they were bad for

- 15 -

two weeks." (*Id.* at 111.)  He did not go back to school for a couple of weeks "[b]ecause I was just going through a lot. . . . Man, it was a lot for me at the time. And I didn't want to be around the police that were there." (*Id.* at 111.)  When asked if Barze ever indicated to him that he wanted to do a pat-down or frisk, Thomas said, "no I wasn't aware of that." (*Id.* at 113.)  He said that after the incident he "had some tears," for about five minutes or so, "I just had a lot of tears coming down because I was mad about what happened in the school." (*Id.* at 114.)

Schmitz was helping a teacher with a different student during both Davis and Thomas' meetings, but testified that when she returned to the SPAN office, Davis was "leaving the office, upset.  And so then I began dealing with him and trying to de-escalate" him; he was "crying, and he was like throwing air punches." (Schmitz Dep. 23.)  She "tried to get him to calm down.  He was pretty upset.  And he headed – I don't know if he headed directly for the front door to leave the building or not.  But he wouldn't talk to me." (*Id.* at 23-24.)  She brought bus tokens to Davis outside the school, and when she returned to her office, people were trying to open Thomas' locker in her hallway, which was jammed.  (*Id.* at 30-31.)  Thomas was there at first, but then he walked away, and she observed that his eyes were red and he was crying. (*Id.* at 31.)  Mills and Barze were still in the SPAN hallway and neither of them said anything to her about what had happened in the SPAN office. (*Id.* at 32.)  She asked Mills if Thomas had been maced because his eyes were so red, and he said that they had not maced him. (*Id.* at 32.)

Schmitz did not get an explanation of what had happened from the police officers, but Renner told her what she thought had happened, because her office was "disheveled." (*Id.* at 33.) She did not think Renner would have told her what Renner thought actually happened "in front of the police officer [Barze]," but Renner did tell her that "they had to restrain [Thomas]" and that she had seen things in her office moved, such as the printer "hanging off the filing cabinet . . . because they had run into the filing cabinet." (*Id.* at 34.) Schmitz further described her office: "the printer was hanging off the side of the filing cabinet. Some of the items that were on top of the heat register were pushed to the side. The box that had been on the floor in front of the heat register had been broken open and everything was all over the floor, like all the markers and school supplies out of there." (*Id.* at 69-70.) Schmitz testified that she believed that Renner told her at this point that the officers had Thomas in a choke hold, but she was not positive. (*Id.* at 34-35.) In response to questioning from Defendants' counsel, she said that Renner "said that Officer Barze was behind Dontae and had his like arm around his neck, and that Dontae was like slamming him against the file cabinet." (*Id.* at 72.) There were boxes of school supplies in her office that were not taped shut, and one of them had been "broken apart and everything was laying all over the floor" – markers and colored pencils, but no scissors to her memory. (*Id.* at 36-37.) Renner was there when they all came out of the office, but she did not remember seeing each of them and did not see Thomas' face. (Renner Dep. 57-58.) Schmitz asked Renner to write an email after the incident, and she did so the next morning. (*Id.* at 54.)

After the incident, Schmitz got in touch with Thomas' father and "told him I wasn't sure what had happened, that there had been an incident in my office with the police, that he left and was in bad shape, or didn't look good . . . it was a very brief conversation.  He said he was going to try to call him on his cellphone."  (Schmitz Dep. 43.)  When she passed Thomas in the hallway after the incident, his eyes were "very red and he had red blotches all over his face."  (*Id.* at 44.)  She did not remember his actual eyeballs, but testified that the "area kind of around from his eyebrows and up there was all bright red."  (*Id.* at 44.)  Thomas' father and stepmother called to tell her that they were at the emergency room and requested the officer's badge number; she told Mills that they wanted it and she asked him for his badge number.  (*Id.* at 44-45.)

## III.   AFTERMATH AND EXPLANATIONS FOR THE MEETING

The parties and witnesses involved offer various explanations for Mills and Barze's intent in holding the meeting in the inner SPAN office with Thomas.

### A.   Thomas

After the incident, Thomas opined that he thought Barze and Mills wanted to talk with him "[b]ecause they felt disrespected and they wanted revenge or something," and that he went there "[b]ecause he said I couldn't go to class and I had to talk to them. I didn't have a choice, really.  If I had a choice to go in there, I would have said no." (Thomas Dep. 134.)  He said that he tried walking away before he went because he thought maybe then he would not have to speak with them.  (*Id.* at 136.)  He said that if the officers would have asked him to allow them to pat him down he would have "let him

- 18 -

because I ain't got nothing on me." (*Id.* at 145.)  He said that when he left the office on that day he was "very emotional.  I don't know.  I just felt weak, and I don't know why I was taken advantage of. . . . And like I was feeling emotional." (*Id.*)  He explained further that he "was just mad that they let the police do this to me in school . . . someplace you are supposed to be and feel safe." (*Id.* at 146.)

In her deposition, Thomas' doctor said that he had petechiae, which are pin-point red dots, around the eyes, some on his neck, and some on the forehead a little.  (Aff. of Andrew J. Noel in Supp. of Mot. to Exclude Expert Testimony, Ex. 4 (Dep. of Roxanne Pierre) 26, Jan. 15, 2014, Docket No. 20.)  She testified, "when I walked in the room I was like, what happened to you?  Because he looked so different compared to the other parts of his body." (*Id.* at 44.)  She concluded that he had injuries consistent with strangulation. (*Id.* at 46.)

### B.    Mills and Barze

During his deposition, Mills was asked why he wanted to speak with Thomas and Davis on January 12, 2012, in response to which he explained:

> [O]ver the last several weeks at Patrick Henry . . . had a lot of tension between the Hmong students and the black students.  We had several large brawls outside and in the lunchroom and in the hallways.  And most of the black students that were involved were in SPAN.  The Hmong students were regular, regular ed kids.  We had sat down, we had meetings with SPAN coordinators, we've had meetings with Hmong parents, black parents, administrators, and trying to get to the bottom of, you know, why this was continuing.  So we were trying to come up with a plan of what we can do so these fights don't continue, so someone doesn't get seriously hurt. . . . And it's hard to do that, you know. when there's brawls in the hallways, when there's brawls in the lunchroom. . . . So that was our goal, that we were trying to stop the tensions between the two groups.

(Mills Dep. 5-6.)[2]  He agreed with his written report that he normally does not speak to students in his office unless it is a criminal manner – "if it's a criminal matter or I think someone's going to be charged with a crime, or let's say an investigator wants to come in to talk to them, I use my office." (*Id.* at 7.)  He later clarified that he did not call Thomas into the SPAN office to investigate any potential or suspected criminal activity and that Thomas was free to leave, (*id.* at 8), and said that he did not remember telling Thomas explicitly that he could leave, but told him that he was not under arrest.  (*Id.* at 26.) When asked about whether his report lists any threats stated by Thomas, he pointed to a statement that the report attributes to Davis ("We should fuck them up.  All they do is hide behind their badges.") and said that both Davis and Thomas said it, and that he "believe[d] that Dontae Thomas was making threats towards Hmong students and officers, along with Mr. Davis, in the lunchroom." (*Id.* at 9-10.)

In contrast to Mills, when Barze was asked during his deposition what criminal activity Thomas was suspected of when he was called into the SPAN office on January 12, Barze answered, "[h]e was suspected of making assaultive threats towards police officers" and nothing else.  (Barze Dep. 12.)  He explained that the information

---

[2] Other witnesses testified in their depositions about tension between Hmong students and black students.  Schmitz recalled that in the days and weeks before January 12 that there was fighting between groups of black students and Hmong students, and she knew that school officials were working on it.  (*Id.* at 60-61.)  Matlock did not specifically recall any problems or racial issues between the students at Patrick Henry High School at that time, but said "[t]here's been general tension between African American students and Hmong students at Patrick Henry through the years. . . . Nothing right at that moment that was on the edge, but ongoing always." (*Id.* at 21.)

about the assaultive threats came exclusively from Mills, that he did not hear any himself. (*Id.* at 13.)

### C.      Schmitz and Other School and District Personnel

Schmitz testified that no one had reported to her at any time that Thomas had threatened to beat up the officers; Mills had told her only that students were playing around at lunch.  (Schmitz Dep. 38.)  When Mills asked her to talk to Thomas and Davis, she thought "he just wanted to talk to them about their behavior in hopes to try to keep the lunchroom more orderly."  (*Id.* at 39.)  Schmitz asked security head Swain about what had happened in the lunchroom because "normally I'm called down to deal with things and I hadn't been for that incident" and "[h]e said he didn't know that anything had." (*Id.* at 45.)  Normally, if a SPAN student received any discipline for something at lunch, she would know about it, but she was not aware of any discipline imposed on any SPAN students at lunch that day.  (*Id.* at 45-46.)  After the incident, she asked Renner to write down in an email about what happened.  (*Id.* at 46-47.)   Since this incident, police officers have not been alone in her office with a student with the door closed.  (*Id.* at 47-48.)  Furthermore, Kim Mesun, the lead counsel for the school district, whom Schmitz thinks is in charge of special education, had instructed at a legal training that there "were not to be any more occasions where an officer and a student were alone in a closed office." (*Id.* at 48-49.)

John Swain is the supervisor of "educated associates" at Patrick Henry High School – he works for the school, not the police – patrolling the hallways, and making

sure that the building, teachers, and students are safe.  (Swain Dep. 11.)  He was working

in the cafeteria on the day of the incident.   (*Id.* at 22.)   According to Swain, police

officers normally do not initiate interactions unless "they're getting directives from" a

school official; he has "never ever seen a police officer initiate something or take

something without a staff member like myself or a dean or a principal say, 'We need to

remove this particular child.'" (*Id.* at 23.)   What he remembers from the day of the

incident is the "police giving a directive, the kid wouldn't follow the directive, verbals

going back, more so from the kid's perspective, final directive, hands on, choke hold . . . .

[T]hat's what I remember with that transpiring." (*Id.* at 24.)

Jason Matlock, the Director of Emergency Management, Safety, and Security for

Minneapolis Public Schools, retrieved a video of the lunchroom from January 12, 2012,

and observed it.  (Matlock Dep. 3, 8-10.)   As far as what he saw on the video, he

observed that "there was no interaction between officers and the kids . . . there's just kids

in the hallways . . . . I couldn't tell you who the kids were." (*Id.* at 11.)  Schmitz also

watched the video from the lunchroom and did not observe any fighting or "ruckus" on

the video; she said it was "dismissal time from lunch, so it's real hard to see what's

happening." (Schmitz Dep. 50-51.)

Matlock remembers hearing from Mills about the incident: "[t]hat they were trying

to counsel a student who had caused a disturbance in the lunchroom and during the

attempt to counsel him it got . . . . I don't remember exact words, what he said, but

basically that the student became aggressive and they needed to use force to restrain the

student." (Matlock Dep. 13.)   He recalled Mills telling him that Thomas had said

something "along the lines of making general statements about, you know things like, 'F the police.' Or, 'I'll F you up.' Or, 'If you didn't have that badge.'   Just general statements.   I couldn't tell you exact specifics, but he made comments that that was the general tone and demeanor of the student during the early interaction in the lunchroom and on the way out of the lunchroom." (*Id.* at 14.)

Matlock recalled Barze's and Mills' account of the event, that they were trying to do a pat search, and "I think . . . [t]hat was what started the aggression, was that they thought that he had something and they wanted to check him as they were talking to him, so that's where . . . . What started as a mentoring turned negative, I guess would be the best way to put it." (*Id.* at 23.)   He further described his discussions about what happened with Mills and Barze after the fact:

> We asked why they had gotten to that point.   And they explained that they were trying to mentor him. That he had been making some statements and other students had been making some statements that were very volatile and negative, that I had mentioned earlier.   And there was some interactions that they were trying to de-escalate and turn positive and then work with the student to help turn him around.   . . . We did discuss the fact that putting him in that situation we – we understand what they were trying to do.   We thought maybe that there could have been more space, a better place to do it, but that at that point that their intentions were positive and so we took it at that.   . . .   They weren't trying to do an interview or anything of a criminal nature, so it was appropriate for the – the most part.   It was just the fact that obviously it went bad, so we looked in and said, 'Okay.   What could have been done differently to not let it go bad.'

(*Id.* at 25.)   He said that:

> [Mills and Barze] were very clear about the fact that this had nothing to do with any crime.   The students hadn't done anything criminal.   They felt that their vocal interactions in the lunchroom were inflammatory.   I guess would be the best way to put it, were not positive.   It's not the interactions that we would want in the school.   And so that they were trying to help by trying to

> reach these kids directly in a mentoring role.  And then in accord with the
> pat-down piece and then that seemed to turn it over from an interaction, a
> mentoring, to obviously there was aggression and a use of force that had to
> be employed.

(*Id.* at 26.)  He again testified that his "understanding from Officer Mills, is that this was

not – they weren't pulling him aside because he had done anything illegal, just that he

had caused this disturbance and his actions were inflammatory and they wanted to try to

talk him through it and see what was going on  with him." (*Id.* at 89.)

When asked if a student could leave a mentoring meeting at any time, Matlock

said yes.  (*Id.* at 98.)  When Matlock was asked whether the officers reported to him

whether there was any aggression before they attempted to pat search Thomas, he said

that he thought

> the way they described it is that he was . . . I don't think they described it
> necessarily aggressive, but not necessarily . . . Not happy. . . .
>
>         . . . .
>
> He wasn't aggressive, but . . . [h]e didn't want to be there, per se.
> He wasn't, you know, happy about being talked to.  He was obviously
> agitated from whatever had occurred that caused him to make those
> statements that they were saying, that the students were all making.
>
> So it wasn't aggression, I would say, as much as just teenage angst
> would be a way to put it.

(*Id.* at 26-27.)  He further explained: "The point of the search was the point that I

remember being the tipping point between what was mentoring and then turned into the

use of force." (*Id.* at 30.)  After the fact, he talked with Barze about how, in the future, it

would be better to try to do this kind of mentoring in a different setting and with a special

education teacher there.  (*Id.* at 32-33.)

Matlock also reported what Barze and Mills told him with regard to what they were trying to mentor Thomas about: "[j]ust about the general tone of the behavior and the acting out and the disrespect of what – the statements earlier we talked about, the negative statements towards the police and interaction with other students.  And being a more positive piece of the community . . . . So it was a very general of all of those things, of any of the behaviors – fighting or arguing or anything that's going on, just trying to get him to not – to not go down that way." (*Id.* at 35.)  He explained that "Officer Mills has always been very big on the fact that he's a member of the North Side.  He's been very strong with how he wants to help these kids not go down a bad path." (*Id.* at 35.) Matlock also said that Mills is "no nonsense . . . . He wants what best for them, but he also understands . . . He's very clear about the fact where the school is, where these kids live is a rough neighborhood and that there are a lot of chances for them to do – to go wrong.  And he works very hard to try to keep them from going wrong." (*Id.* at 64.) When asked if Mills and Barze told him what crimes they suspected Thomas of when they did the pat search, he said, "I don't believe they ever said crimes.  They said that they saw . . . there was something in his pocket.  There was a bulge or something in his pocket, that they wanted to find out what it was.  It was never about – but they never specifically told me if they thought it was – what it was in there, just that it was something." (*Id.* at 35-36.)  He never found out what was in Thomas' pockets. (*Id.* at 36.)

## IV.    THIS ACTION

Thomas filed this action on September 13, 2013.  (Compl., Sept. 13, 2013, Docket No. 1.)  The complaint alleges three counts for violation of the Fourth Amendment under 42 U.S.C. § 1983: Count I against Barze for excessive force, false arrest, and unreasonable seizure; Count II against Mills for excessive force ("via his active encouragement of Barze and his failure to intervene"), false arrest, and unreasonable seizure; and Count III against the City under *Monell*.  Defendants answered the complaint and now move for summary judgment on all claims except for the excessive force claim against Barze.  Thomas noted in his opposition brief that he voluntarily dismisses his claims against the City (*see* Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 1 n.1, Feb. 5, 2014, Docket No. 28), but opposes the motion on all other grounds.

Defendants retained Joshua Lego to provide expert testimony at trial regarding police practices, and Thomas moves to exclude his testimony on the grounds that Lego treats Barze's version of the events on January 12, 2012, as true and reaches inappropriate legal and medical conclusions.  (*See generally* Mem. in Supp. of Mot. to Exclude Expert Testimony, Jan. 15, 2014, Docket No. 19.)  The Court concludes that, taking the facts in a light most favorable to Thomas, a reasonable jury could find that Mills and Barze violated his Fourth Amendment rights against false arrest and unreasonable seizure, and that Mills' encouragement or failure to intervene violated Thomas' rights against excessive force.  The Court will thus deny the motion for summary judgment with regard to Barze and Mills.  The Court will grant Thomas'

motion to strike Lego's expert report and give Defendants fourteen days to file another report that comports with the parameters discussed herein.

## ANALYSIS

## I.   MOTION TO EXCLUDE EXPERT TESTIMONY AND REPORT

Thomas moves to exclude the report and testimony of Defendants' expert Joshua Lego.  Thomas argues that Lego's opinion is flawed for three reasons: because his opinions improperly give credibility to Barze's and Mills' testimony about what occurred on January 12, 2012, because he improperly reaches legal conclusions, and because his report contains medical opinions he is not qualified to make.  Thomas argues that if Lego is allowed to testify, he should be barred from offering testimony on the legality of Thomas' seizure, the reasonableness of the force used, and the cause and severity of Thomas' injuries.

### A.   Lego's Qualifications Report

Lego is a Sergeant with the St. Paul Police Department.  He holds a B.A. in Law Enforcement from Minnesota State University, Mankato, and an M.A. in Education from the University of St. Thomas.  (Aff. of Andrew J. Noel, Ex. 3 ("Lego Expert Report") at 1, Jan. 15, 2014, Docket No. 20.)  He has served as a use of force instructor, Police Academy instructor and supervisor, Executive Officer to the Chief of Major Crimes and Investigations, and Acting Commander of the Family and Sexual Violence Unit.  (*Id.* at 1-2.)  He is currently assigned as a domestic assault investigator in the Family and Sexual Violence Unit.  (*Id.* at 2.)  He has been certified as a use of force and firearms instructor

by the Minnesota Bureau of Criminal Apprehension since 2002, and accordingly has delivered training on the use of force to "approximately 1700 pre-service police officers and over 3,000 in-service police officers." (*Id.*)  He served on the St. Paul Police Special Weapons and Tactics team for seven years, through which he received training in constitutional precedents related to reasonable searches and seizures. (*Id.* at 3.)  He has developed an 80-hour Use of Force Instructor Certification course at the St. Paul Police Department, and has trained and certified over 250 use of force instructors. (*Id.* at 3-4.)  He has worked for and been certified by the Force Science Institute, which "conducts the leading research into human performance in police use of force incidents." (*Id.* at 4.)  He states that he is currently an investigator in the St. Paul Police Family and Sexual Violence Unit, which involves regular examination of evidence and statements related to felony and misdemeanor domestic assault, and for which he has received specialized training from medical professionals about intra-cranial hemorrhaging and petechiae as a result of physical trauma. (*Id.*)  For this case, he reviewed, among other documents, the complaint, the crime lab photos, the statements of Officers Mills and Barze, Thomas' statement, the depositions taken of all witnesses and parties and accompanying exhibits, the video of the lunchroom that day, Thomas' medical records, and Thomas' expert report. (*Id.* at 5-6.)

On the basis of this review, Lego produced a written report for this litigation.  His report includes extensive opinions regarding police practices and training standards.  For example, his report includes the following opinions:

- "Mills and Barze's decision to conduct an investigation into this matter was made in a manner consistent with how other police officers in the United States would proceed if faced with similar circumstances." (*Id.* at 9.)

- "A vascular neck restraint is applied when an officer encircles one of his arms around the neck of a person and, while stabilizing their head and body, the officer applies pressure to the veins alongside the neck and upper chest of the person." (*Id.* at 11.)

- "Simultaneously, Mills was speaking to Thomas and directing him to stop fighting with Barze.  Such a blending of force option application between two police officers working in the same space and time is representative of good police officer decision making and should be applauded instead of called into question.  The goal of an assisting officer, like Mills, is to enhance the effectiveness of force options selected by another officer and not interfere with an otherwise constructive application of force options." (*Id.* at 11.)

- "It is my opinion that Barze did follow a natural progression of force options that is commensurate with what other reasonably trained police officers might have done if faced with similar circumstances." (*Id.* at 19.)

The record also includes Lego's deposition testimony.  (Aff. of Andrew J. Noel, Ex. 2 (Dep. of Joshua Lego ("Lego Dep.")), Jan. 15, 2014, Docket No. 20.)  Thomas argues that certain admissions in Lego's deposition undermine his opinions in the report.  For example, Lego states in his deposition that he did not find Thomas' testimony credible, and did not credit that evidence, explaining:

> What I have written here is what I believe happened that day.  And I'm not calling him, Mr. Thomas a liar.  I'm not saying he's being deceitful.  I'm saying I would say that he testified at deposition to his recollection, just like the officers testified to their recollection. And it is upon those sworn statements, those recollections, that I base my opinion on.

(*Id.* at 21.)  Thomas argues that such testimony demonstrates that Lego's report is purely based on crediting Barze's rather than Thomas' testimony.

### B.      Analysis

### 1.      Standard of Review

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Fed. R. Civ. P. 702.  Under Rule 702, proposed expert testimony must satisfy three prerequisites to be admitted.  *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  *Id.*  Second, the proposed witness must be qualified.  *Id.*  "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires."  *Id.*  (internal quotation marks omitted).  The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597–98 (1993).

Courts have concluded that certain types of expert testimony are not admissible. For example, "expert testimony on legal matters is not admissible," but rather "[m]atters of law are for the trial judge, and it is the judge's job to instruct the jury on them." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).  Legal conclusions are also not admissible.  *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (expert testimony on reasonableness of police behavior in light of Fourth Amendment standards is statement of legal conclusions and not admissible).  In contrast, expert testimony on "industry practice or standards may often be relevant . . .

and expert or fact testimony on what these are is often admissible." *S. Pine Helicopters*, 320 F.3d at 841.

### 2.    Factual Conclusions and Credibility Suggestions

Thomas argues that Lego's entire testimony should be excluded because he bases his opinions on a version of the facts which assumes Barze's and Mill's testimony to be true and gives the impression that he has weighed the credibility of Thomas' versus Barze's stories and credited Barze's.  The Supreme Court has held that "an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true," *Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012), and that it then becomes the responsibility of the party calling the expert "to introduce other evidence establishing the facts assumed by the expert," *id*.  Observing that courts formerly required experts "to testify in the form of an answer to a hypothetical question," the Supreme Court commented that "modern practice does not demand this formality and, in appropriate cases, permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts." *Id*.

However, "[t]here is a critical distinction between an expert testifying that a disputed fact actually occurred or that one witness is more credible than another and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine.  The former is manifestly improper, the latter is not." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006).  Thus, an expert may testify to opinions where her opinion is based on facts, the truth of which she would or could not

testify to.   Here, that would mean that Lego can testify to his opinion about whether a certain action by Barze in a certain circumstance, assuming that those are the facts, would be consistent with police practices.   But Thomas' argument is that Lego's opinion not only is based on an assumption that Barze's version of the events is true, but also appears to **actually adopt and endorse** Barze's version of the events.   If true, this would be improper usurpation of the jury's role.   *See United States v. Whitted*, 11 F.3d 782, 785-86 (8th Cir. 1993) (expert's "opinion that sexual abuse has in fact occurred" is not ordinarily admissible, nor can an expert "pass judgment on the alleged victim's truthfulness in the guise of a medical opinion, because it is the jury's function to decide credibility").

The Court concludes that Lego's report includes inadmissible opinions, as it includes both statements that directly opine on what factually occurred, and otherwise permissible expert opinions which are too intertwined with Defendants' version of events and fail to clarify that assumption.   His report includes many statements that, without a disclaimer as to any assumptions he is making, sound like factual statements.   For example, he states:

> Mills' attention was drawn to [Thomas] and another student due to their unruly behavior and verbal comments that expressed their intent to cause bodily harm to others when the officers approached . . . . I find it remarkable that [Mill's] attention was so narrowly focused despite so many other people present in the area.   It is my opinion that Mills' attention was initially drawn to these students because their behavior was out of line with school rules.

(Lego Expert Report 7.)   He also states that "Thomas was not compliant with Barze's many verbal requests to stand up from his seated position," and "[i]t is my opinion, based on reason and inference, **Thomas was conspicuously ignoring Barze and Mills** as he

sat in the chair and actively resisted Barze's attempt to move him to a standing position

with an escort hold." (*Id.* at 10 (emphasis added).)  This apparent recitation of the facts

continues:

> Thomas suddenly became combative.  According to Barze, Thomas popped
> up out of the chair so suddenly the plastic of the chair made a noise as if the
> hydraulic compression in the chair stem had sprung upward as well.  Barze
> maintained the escort-hold on Thomas' arm.  When Thomas spun toward
> Barze, as if to confront him directly, Thomas lost his balance and fell to the
> floor.

(*Id.*)  These statements are not directly tied to any expertise in police practices, but rather

appear to comment directly on what occurred during the incident (for example that

Thomas was combative, not compliant, conspicuously ignoring Barze and Mills, and that

the students at Thomas' table were behaving in an unruly manner and were out of line

with school rules).  Not only are these factual determinations that are the province of the

jury, they are factual conclusions that are not within Lego's personal experience and

instead are matters to which Barze and Mills could testify, testimony which the jury

could choose to believe or not.  (*See, e.g.*, *id.* at 11 ("After speaking to Barze, I learned

that it was his sense that, if the filing cabinet had not been in its place, he would have

been completely knocked over by Thomas' assault.  This **intentional and purposeful**

**action** by Thomas caused Barze to feel pain and to **fear an immediate** assault and

battery was occurring." (emphasis in original)).)

His report also includes statements that involve opinions that are based on his

expertise in police practices, but that are so intertwined with Barze's version of events

that a jury could easily mistake them for opinions as to what actually occurred.  For

example, Lego's report includes an entire section labeled "Thomas is Solely Responsible For the Events That Transpired." (*Id.* at 13.) In that section he states that "[w]hat is at issue is [Thomas'] conspicuous ignoring of lawful verbal directions of police officers pursuant to a bona-fide police investigation and his subsequent violent behavior." (*Id.* at 13.) He also states in that section:

> Had Thomas merely complied with the verbal directions given to him by Barze and Mills, the need to use force to control his violent and resistive behavior would have been obviated. Unfortunately, Thomas elevated the perceived threat from that of a reasonable suspicion that criminal activity may be afoot to probable cause that Thomas indeed represented a physical and potentially criminal threat.

(*Id.* at 13.) The report also includes the opinion that "Barze was placed **behind** Thomas as a result of Thomas' assaultive behavior. Barze had no choice but to apply a technique in which he had been trained to control the violent behavior exhibited when he found himself at the subject's posterior . . . ." (*Id.* at 17 (emphasis in original).) This opinion would seem to be an otherwise acceptable expert opinion – that when a subject is behind the officer, an officer has limited choices and must find a way to control violent behavior – but the way it is presented is entirely tied up in Barze's own version of the facts.

These intertwined opinions are similar to those the court excluded in *Jordan v. City of Chicago*, Civ. No. 08-6902, 2012 WL 88158 (N.D. Ill. Jan. 11, 2012). There, the court faced a challenge to the plaintiff's expert on the basis that they were "intertwined inextricably with, and rest[ed] entirely on, improper credibility determinations." *Id.* at *3. The plaintiff who sought to introduce the expert acknowledged that opinions regarding witness credibility are inadmissible, but argued that "the remainder of

Mr. Hall's opinions are admissible because they are based on factual assumptions that are supported by the evidence." *Id.*   The court observed that "[i]t is well-settled that determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of that testimony," and rejected plaintiff's arguments that the expert's opinions were not credibility determinations per se, but rather expert opinions merely based on plaintiff's version of the facts. *Id.* at *4.  Thus, the court concluded that it was

> simply not feasible to extract non-credibility opinions from the credibility opinions in Mr. Hall's report given that the entire report is premised on his evaluation of which witnesses are believable.  His conclusions, therefore, are inextricably intertwined with his credibility determinations and are not, as Plaintiff suggests, merely based on factual assumptions . . . .  In other words, his opinions rise and fall with his credibility determination.

*Id.* at *6.  As in *Jordan*, much of Lego's testimony is at least phrased in a way that makes no distinction between his opinion of what, assuming that the facts occurred as Barze described them, **would have been** appropriate and what **was** appropriate.  At no point in his report does Lego establish that his opinions are based on an **assumption** that Barze and Mills' version of the facts is true, but rather, he repeatedly presents his opinions **based on** a version of the facts that appears to be his own conclusions about what occurred.  Thus, his testimony is more comparable to an "expert testifying that a disputed fact actually occurred or that one witness is more credible than another," rather than "an

expert giving an opinion based upon factual assumptions, the validity of which are for the

jury to determine." *Richman*, 415 F. Supp. 2d at 942.[3]

### 3. Legal Conclusions

Thomas also argues that many of Lego's opinions are impermissible legal

conclusions about whether there was reasonable suspicion or probable cause to

investigate and interview Thomas. The Eighth Circuit has held that legal conclusions

about the reasonableness of police behavior in light of the Fourth Amendment are

inadmissible. *See Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009) (citing

*Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995)).

Defendants argue that his opinions are not the type of legal conclusions barred by

*Peterson* because his "specialized knowledge about force incidents will help the jury

understand the evidence regarding police use of force and examine the factors [in]

*Graham v. Connor*." (Def.'s Mem. in Opp'n to Pl.'s Mot. to Exclude Expert at 4, Feb. 5,

2014, Docket No. 29.) They further argue that even if he cannot testify as to whether

---

[3] In reaching this conclusion, the Court does not consider Lego's post-report testimony in his deposition about how he reached the conclusions in his report and his assessment of Thomas' credibility. Defendants take issue with Thomas' reliance on Lego's deposition testimony in which he states that he does "not believe" that Thomas' account is actually what happened. (*See* Lego Dep. at 19.) Defendants argue that Thomas' counsel set a trap for Lego by asking his opinion on the credibility, although it is never explicitly expressed in his expert report, and then using his answer to that question to undermine his report. Defendants warn that excluding the testimony on this ground would create bad litigation strategy incentives (i.e., to ask experts their opinion on witnesses' credibility in deposition in order to undermine the partiality of the report). The Court concludes that Lego's written report alone includes enough improper opinions which appear to opine on what factually occurred or that are inextricably tied to one version of the events such that the deposition testimony is not necessary in order to conclude that Lego's opinions in the report are improper.

force is "objectively reasonable," he should still be able to testify how officers are trained, what force options are available to them, and what is consistent with training procedures.

Legal conclusions are distinct from industry practices and standards, which are generally admissible. *See S. Pine Helicopters*, 320 F.3d at 841. Defendants argue that, although Lego uses phrases that **can** have legal meanings, such as "reasonable articulable suspicion" and "objectively reasonable," he uses those terms in the context of standards used in police officer training. The Court observes that, although it may be permissible to use those terms with regard to their training as opposed to legal connotations, there are several instances in which Lego uses those terms explicitly with reference to their legal, rather than training, significance. For example, Lego states:

> A critic may try to suggest Barze and Mills' request to meet Thomas in the school office was an unreasonable police detention. I disagree. It is **clearly established in law** that a police officer may temporarily detain a person if they believe criminal activity is afoot for the purposes of investigation and the potential detection of criminal behavior. Moreover, police officers are allowed to conduct an investigation in any place where the officers have a right to be present. A police determination to conduct an investigation is not formed exclusively upon probable cause but may also be established upon the reasonable articulable suspicion of the investigating officer. It is clear in this instance that Mills and Barze had established such a reasonable articulable suspicion that criminal activity may be afoot.

(Lego Expert Report 9 (emphasis added).) In this example, he based his opinion on what he believes is "clearly established in law," which gives the appearance of setting up the rest of his opinion as an application of the facts, as he understands them, to law.

In a different section of his report, Lego actually engages in analysis and interpretation of legal opinions. He begins the section titled "The Use Of Force By

Officers In This Circumstance Was Reasonably Necessary" by citing to *Graham v. Connor*, 490 U.S. 386 (1989), and explains that *Graham* outlines the "concept of the **calculus of reasonableness** when examining police use of force." (*Id.* at 16.) He further states that "[m]y experience in police work and law enforcement education leads me to believe the word **calculus** is used in *Graham* on purpose. It is used to properly illustrate the significant and complex assessments made in a very short period of time by police officers at the time force is being contemplated or applied." (*Id.* at 16 (emphasis original).) He later quotes directly from *Graham* and states that "[t]his is a critical component of the precedent that must be considered in addition to the three-pronged test." (*Id.* at 16.) Although it might be appropriate for a police practices expert to testify as to how certain Supreme Court opinions have affected police training, this section of his report purports to interpret *Graham* for its **legal meaning**, which is outside his expertise and the proper scope of an expert's testimony. *See Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) ("Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury.")

Beyond interpreting the state of the law on the use of force, Lego also reaches the conclusion that "[i]t is my opinion [that] the actions undertaken by Barze in the attempt to defend himself from harm and to control Thomas' unlawful and resistive behavior were within the boundaries of accepted police practices and training as instructed by *Graham*." (*Id.* at 18.) Although it is permissible to compare Barze's and Mills' version of what occurred to standard police practices, Lego's analysis also reaches a conclusion

about the application of the standards set out in *Graham* to Barze's and Mill's actions, which is not permissible.  *See Schmidt*, 557 F.3d at 570 ("Russo's report consisted of his opinions regarding the overall reasonableness of the procedures used and, as such, were not fact-based opinions.").

### 4.    Medical Testimony

Finally, Thomas argues that Lego improperly opines on the cause of Thomas' injuries and refutes Thomas' treating physician's opinion without being qualified to do so.  Defendants argue that Lego's experience as a domestic assault investigator, use of force instructor, and Acting Commander of the Family and Sexual Violence Unit gives him experience in evidence related to domestic assaults, including strangulation, and that his specialized training about the incidence of intra-cranial hemorrhaging and petechiae qualifies him to help the jury with his specialized knowledge about the physical appearance of individuals upon whom neck restraints have been used.  (Defs.' Mem. in Opp'n to Mot. to Strike Expert at 19-20.)

Police officers may be qualified by their experience to testify as expert witnesses. *See United States v. Boykin*, 986 F.2d 270, 275 (8th Cir. 1993).  However, for an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion.  *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 283–84 (8th Cir. 1995).  The portion of Lego's report that comments on Thomas' injuries includes a statement that:

> A person is likely to suffer a petechial hemorrhage – pinpoint like bruising
> on the face, neck, eyelids, eyeballs – as a result of an offensive physical

contact coupled with their **vigorous resistance against that bodily contact**. . . .  [I]t is not the application of force or pressure onto a person's neck that cause the petechiae to occur.

(Lego Expert Report 14 (emphasis added).)  He also states:

Dr. Pierre stated at her deposition that she observed "quite profound" petechiae during her treatment of Thomas.  I must disagree with her assessment that the discoloration on Thomas' face and eyes are representative of profound petechiae.  In my experience as a domestic assault investigator, I have examined photographic evidence and seen in-person injuries that far better and dynamically illustrate what can be referred to as profound petechiae.

(*Id.*)  He further states that he "believe[s] the redness observed on Thomas [sic] face during his medical examination was caused by his struggle against Barze's effort to control him and was due to either skin-on-skin or fabric-on-skin abrasion instead of due to petechiae hemmorage [sic]."  (*Id.* at 15.)  He thus concludes that "[i]t is my opinion that the superficial redness observed by Dr. Pierre . . . was caused by Thomas' active and assaultive aggression and physical struggle against Barze at the time of the incident."  (*Id.* at 15-16.)

Defendants argue that these opinions are permissible, relying on the Eighth Circuit's opinion in *United States v. Roach*, 644 F.3d 763 (8th Cir. 2011), which they argue indicates that an expert can be qualified based on experience, even when a topic is not within their traditional field of expertise.  There, the defendant argued that a physician was not qualified to testify about the emotional and behavioral characteristics of sexually abused children because he lacked formal education or training in child psychology and psychiatry.  *Id.* at 764.  The court concluded that his experience of regularly examining and evaluating over 200 sexually abused children over the past seven

years was a sufficient basis for permitting him to testify about the general characteristics of sexually abused children.

*Roach* indicates that some of Lego's testimony about Thomas' injuries – those based on his experience administering neck restraints, such as a statement that he has administered a certain number of neck restraints but has never seen a case of petechiae where there was not resistance – is appropriate.   Other portions of his report, however – particularly those about the medical causes of Thomas' injuries in particular, such as that Thomas' petechiae was **not** from the neck restraint but rather abrasion – are beyond the realm of his expertise.   For example, Lego states in his report:

> In my experience as a police officer, force instructor, and certified trainer in the New Lateral Vascular Neck Restraint, I have applied this force option – and had it applied on me – several hundred times over the past 12 years. Never once have I suffered a petechial hemorrhage nor have I caused a petechial hemorrhage on another person.   This is because I have never applied the vascular neck restraint onto a continually violent and actively resistant person.

(Lego Expert Report 14.)   The first part of this quote is within Lego's personal experience, but the last sentence, which both comments on Thomas' behavior and implies that the petechiae was caused by such behavior, is beyond his expertise.

In light of these myriad problems with Lego's report – his opinions as to factually what occurred, his opinions that are inextricably intertwined with one version of events, and his opinions that reach legal and medical conclusions beyond his expertise – the Court determines that the report in its entirety should be struck.   Although there are opinions in his report from which a proper police practices expert opinion could be extricated, Defendants have not made a serious attempt to do this, and the Court is not

required to do such detailed extrication of proper opinions for Defendants. *See Schmidt*, 557 F.3d 564 (holding it was not an abuse of discretion to exclude expert testimony on the reasonableness of police procedures in its entirety, even though some of the testimony may have been proper, where the expert's proponent did not specify which portions of the opinion were proper and which were not).[4]   The Court will therefore grant Thomas' motion to strike Lego's report, but will permit Defendants to file a modified version of the report.   Defendants have 14 days to submit a modified version of the expert report that excludes any of the types of statements or opinions that the Court has deemed improper.   The modified report may not include any **new** opinions or statements beyond the scope or in addition to that which is included in the present report, but shall merely omit all of the opinions that the Court has deemed improper so that the Court and Thomas may anticipate the admissible testimony Lego would present at trial.

---

[4] The parties include several other pieces of documentary evidence with regard to this motion: Lego's deposition, the report of Thomas' expert John Ryan, Ryan's deposition, and the deposition of Thomas' treating physician, Dr. Roxanne Pierre.  Ryan's report is not at issue in the motions before the Court, although Defendants argue that the infirmities Thomas points to in Lego's report are similarly present in Ryan's report.  The Court does not find Ryan's report to contain problems similar to those in Lego's report.  First, rather than stating the facts as if they are the expert's opinion of **what occurred**, Ryan recites what each person said about what occurred. Second, rather than connecting his opinions to legal standards, he connects them to law enforcement standards. (*See, e.g.*, Decl. of Andrea Naef, Ex. 1 (Ryan Expert Report) ¶ 61, Feb. 5, 2014, Docket No. 30 ("It is my opinion . . . . that Officer Barze and Mills accomplished a law enforcement seizure."); *see also id.* ¶ 69 ("It is my opinion . . . that the officers' actions with respect to the pat-down search of Donte Thomas was contrary to all generally accepted policies, practices, training, and legal mandates with respect to these pat-downs.").)

## II.  MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.  Unreasonable Seizure and False Arrest Against Barze and Mills

Defendants move for summary judgment on Thomas' claims for unreasonable seizure and false arrest in violation of the Fourth Amendment against both Barze and Mills.

### 1.  Standard of Fourth Amendment Protection in School Context

The parties initially dispute the degree of Fourth Amendment protection to which Thomas was entitled, given that the alleged seizure and false arrest occurred in a public school.  The Fourth Amendment applies to searches and seizures by school officials in the school context, but the Supreme Court has "reduced the level of suspicion of illicit activity that is needed to justify a search," such that "the legality of a search of a student

should depend simply on the reasonableness, under all the circumstances, of the search."
*Cason v. Cook*, 810 F.2d 188, 191 (8th Cir. 1987) (citing *New Jersey v. T.L.O.* ("*TLO*"), 469 U.S. 325, 334 (1985)).  The parties dispute whether the relaxed *TLO* standard applies in this context: in a school, but where the seizure was implemented by a police officer rather than a teacher or other school official.

Eighth Circuit precedent in this context indicates that whether *TLO* or traditional Fourth Amendment standards apply depends on the extent to which the search or seizure was initiated and conducted by school officials as opposed to law enforcement officials. In *Cason*, the Eighth Circuit held that a search conducted by school officials in conjunction with a police liaison officer was subject to *TLO*'s relaxed standard.  810 F.2d at 191-92.  The court observed that there was "no evidence to support the proposition that the activities were at the behest of a law enforcement agency," and that the "uncontradicted evidence" showed that the school official – the vice principal – conducted the investigation and that the police liaison's involvement "was limited to a pat-down search conducted after a coin purse matching the description of the one stolen was found and to briefly interviewing [students] and presenting juvenile appearance cards to the girls." *Id.* at 191-92.  The court further observed that it was the school official who conducted the initial search, and it was only after she discovered a stolen item in that search that the police liaison officer conducted a pat-down, and the only other involvement was after the students were unable to agree on the events that led to the incident, such that the liaison officer's further "involvement was limited to some questioning and the issuance of juvenile appearance cards." *Id.* at 192.  Thus, the court

concluded that "[a]t most, . . . this case represents a police officer working **in conjunction with** school officials," and that in such a circumstance the relaxed *TLO* standard applied. *Id.*

*Cason* has been cited in support of the proposition that *TLO* applies to searches conducted by law enforcement officials at the behest of school officials, but that "when confronted with a search . . . initiated by law enforcement officers not under the supervisory control of school authorities, courts have uniformly held that probable cause is required." *Reynolds v. City of Anchorage*, 379 F.3d 358, 372-73 (6th Cir. 2004) (Nelson Moore, C.J., dissenting). This distinction – that *TLO* applies when a search is initiated by school officials – is further supported by another Eighth Circuit case. In *Shade v. City of Farmington, Minn.*, 309 F.3d 1054 (8th Cir. 2002), the Eighth Circuit addressed whether *TLO*'s standard applied where law enforcement officers were involved in searching a student and the search occurred away from traditional school grounds. The court observed that the police officers there played a "more substantial role in the investigation and search" than the officer did in *Cason*, but concluded that the "extent of their involvement does not distinguish this case from *Cason*." *Id.* at 1060. The court reasoned that, because the student was seen with a knife, it was "entirely reasonable" for the officers to play a greater role in questioning and directing the mechanics of the search. *Id.* The court ultimately concluded that, even though the incident occurred off of school property, "**[b]ecause school officials initiated the investigation and search** of Shade in furtherance of the school's interest in maintaining a safe learning environment, and because they asked officers to assist them in furtherance of that interest, we hold that

- 45 -

T.L.O.'s two-part inquiry governs the lawfulness of the search conducted by [the officers]." *Id.* at 1061 (emphasis added).

*Cason* and *Shade* involved circumstances in which law enforcement officials conducted a search **at the behest of school officials**, in which it is appropriate to apply *TLO*'s relaxed standard. *See also Milligan v. City of Slidell*, 226 F.3d 652, 653 (5th Cir. 2000) (applying *TLO* where vice principal called students from class for questioning and then permitted students to be questioned by officers). The reasoning in these cases suggests that *TLO* would not apply when the search or seizure was initiated by the police or law enforcement, rather than a school official. Here the evidence – which Defendants do not dispute – suggests that it was Barze and Mills, not Schmitz or other school personnel – who conceived of the idea for the meeting in the SPAN office with Thomas. Barze and Mills sought out Schmitz's permission to hold Thomas after lunch and use her office for a meeting; Schmitz did not know the purpose of the meeting, but agreed.

Consistent with the reasoning in *Shade* and *Cason*, courts addressing circumstances like these, where the idea for the search or seizure originated with law enforcement officials and did not involve school officials, have held that students in such circumstances are entitled to the full protection of the Fourth Amendment, rather than *TLO*'s relaxed standard. *See, e.g.*, *State v. Tywayne H.*, 933 P.2d 251, 254 (Ct. App. N.M. 1997) (holding *TLO* did not apply where the search "was not conducted by school authorities on their own initiative or even by school authorities with or at the direction of a law enforcement agency," but rather "was conducted completely at the discretion of the police officers," school official involvement was minimal, and "[d]uring the pat-down

- 46 -

search itself, there were no school authorities present"); *A.J.M. v. State*, 617 So. 2d 1137, 1138 (Fla. Dist. Ct. App. 1993) (observing that "the Supreme Court [in *TLO*] specifically noted that it was considering only those searches carried out by school officials acting alone and on their own authority, and it was not addressing the question of what standard would apply when a search is conducted by school officials in conjunction with or at the behest of the police" and declining to apply *TLO* where school resource officer searched students at school).

Defendants argue that the interview was not conceived by Barze and Mills because it was Swain, the head of Patrick Henry's security, who initially asked Barze and Mills to pay Thomas' table a visit during lunch time.  But Swain's request to Barze and Mills did not include any indication that they should take two students aside for a post-lunch meeting in a private office, and Defendants present no support for expanding the scope of what it means to initiate a search or arrest in the school context to all suggestions leading up to the decision to detain a student.  Furthermore, the most reasonable interpretation of the evidence presented in deposition testimony is that Barze and Mills decided to meet individually with Thomas and Davis after they supposedly made comments to them, **after they approached** Thomas' and Davis' table upon Swain's suggestion.

Defendants also argue that, as in *Shade*, a "high level of officer involvement was reasonable because Plaintiff had been verbally threatening to officers, the school had recently experienced large fights, and Plaintiff was believed to potentially be inciting another fight."  (Defs.' Mem. in Supp. of Summ. J. at 13-14, Jan. 15, 2014, Docket No. 23; *see also id.* (arguing that "Plaintiff was called into the SPAN office due to

concerns about the possibility of another fight between African-American and Hmong students, as well as his own disobedient and disrespectful behavior," such that the school was "doing exactly what the *TLO* standard was intended to permit" – keeping order in an educational environment).)   These arguments rely on disputed factual conclusions regarding Thomas' conduct and rationales for Barze's and Mills' interview which are not the only rationales supported by the evidence.  Furthermore, these arguments put the cart before the horse by seeking to justify the use of the relaxed *TLO* standard by arguing that the interview **would be** justified under the *TLO* standard.  The Court declines to apply *TLO* on the basis of these arguments.

To the extent that Defendants argue that Mills or Barze should be considered as school officials rather than law enforcement officials, that argument is not supported by the Eighth Circuit's case law.  In *Cason*, the individual whom the court treated as "law enforcement" was "a police officer who had been assigned to North High School as a liaison officer pursuant to an established police liaison program between the Des Moines Police Department and the school district," which was "funded jointly by the police department and the school district" and through which "liaison officer[s were] instructed to cooperate with the school officials."  *Cason*, 810 F.2d at 190; *see also Shade*, 309 F.3d at 1057 (school officials were coordinator and principal of alternative school).  This is comparable to the SRO program through which Mills was a school officer.  Barze, who was not part of the SRO program but was rather hired directly by the school as a part-time, off-duty law enforcement officer, is even less reasonably considered to be a school official.

The Court concludes that here, where the idea and execution of the interview was entirely directed by the law enforcement officer rather than the school official, traditional Fourth Amendment principles, rather than the relaxed standards of *TLO*, apply.   The Court will proceed to analyze the evidence in support of Thomas' unreasonable seizure and false arrest claims under traditional Fourth Amendment standards.   However, to the extent that, for qualified immunity purposes, it was not clearly established in January 2012 that *TLO* would not apply in such circumstances in the Eighth Circuit, the Court also concludes that, even under *TLO*'s relaxed standard, summary judgment for Barze and Mills would not be appropriate.

### 2.   Unreasonable Seizure and False Arrest

To establish a Fourth Amendment violation for unreasonable seizure, a plaintiff "must demonstrate both that [the state actor] seized her within the meaning of the Fourth Amendment and that the seizure was unreasonable." *Andrews v. Fuoss*, 417 F.3d 813, 816 (8th Cir. 2005).  "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

To justify a limited and momentary detention of a person without violating the Fourth Amendment's proscription against an unreasonable seizure, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21

(footnote omitted).[5]  "While police must have probable cause in order to arrest (or seize) a person, they need only have reasonable suspicion that criminal activity is afoot to stop someone."  *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (citing *Terry*, 392 U.S. at 27).  Such suspicion is reasonable if the officer "knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed," *United States v. Hernandez–Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003).  To determine whether the police had reasonable suspicion, courts must examine the totality of the circumstances.  *Gannon*, 531 F.3d at 661.

Taking the facts in a light most favorable to Thomas, the Court concludes that a reasonable jury could find both that Barze and Mills' meeting with Thomas in the SPAN office was a seizure and that they lacked particularized, reasonable suspicion to support such a seizure.  On the first point, there is evidence in the record to support a reasonable jury determination that Thomas was not free to leave.  Thomas testified that he did not feel free to leave, and although Mills and Barze testified that they thought Thomas was free to leave, Barze acknowledged that once they started a pat-down Thomas would not have been free to leave.

On the second point, the various deponents in this case offer a wide range of explanations for why Barze and Mills required Thomas to meet with them, and from that

---

[5] It is not clear whether Thomas seeks to treat the SPAN office meeting as an investigatory stop, which would be governed by *Terry v. Ohio*, 392 U.S. 1, or an arrest, which would require probable cause.  Because the Court concludes that a reasonable jury could find that Barze and Mills lacked reasonable suspicion required for an investigatory stop, it need not address whether they had probable cause for an arrest, which is a more demanding standard.

wide range, a reasonable jury would have plenty of bases to conclude that Barze and Mills lacked reasonable suspicion.  If the jury credited Thomas' testimony, it would find that Barze and Mills' basis for the interview was because they felt disrespected by him.  But even crediting Mills' testimony would permit a jury to find for Thomas.  Mills' explanation was they were trying to preempt fights between black and Hmong students, but his testimony about having heard students make threats to harm Hmong students was not particularized to Thomas, as is required for reasonable suspicion.  *See United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004) ("To detain a person, law enforcement agents must have reasonable suspicion that criminal activity is afoot."); *cf. United States v. Mora–Higuera*, 269 F.3d 905, 909 (8th Cir. 2001) ("An investigative stop of a vehicle does not violate the Fourth Amendment where the police have a reasonable suspicion that the occupant of the vehicle is engaged in criminal activity.").  Furthermore, he admitted in his deposition that the meeting was not on account of any suspicion of actual wrongdoing by Thomas.

Barze testified that they held Thomas because he was suspected of making assaultive threats on police officers, but Matlock testified that Barze and Mills told him the purpose of the meeting was for mentoring.  Furthermore, Barze did not hear these threats himself, but rather from Mills, who did not include them in his written report.  In contrast, Swain's recollection is that Thomas was not following directions, and Defendants have not made any argument that not following directions as understood by Thomas would be a basis for a stop under *Terry*.  Thus, looking at any one of these explanations, a jury could conclude that each of the witnesses' individual explanations

falls short of demonstrating that the detention was based on reasonable suspicion. Furthermore, the varying and disparate explanations, particularly the inconsistencies between Barze's and Mills' explanations, would permit a jury to discredit Barze's and Mills' testimony and conclude that the detention lacked reasonable suspicion.

### 3.    *TLO* Standard

Under *TLO*, "[t]he inquiry into the reasonableness of a search is twofold: First, the action must be justified at its inception and second, the scope of the search must be reasonably related to the circumstances which justified the interference in the first place." *Cason*, 810 F.2d at 191.  A search satisfies the first inquiry when there are reasonable grounds for suspecting that the search will uncover evidence of a rule or criminal violation. The second inquiry is satisfied when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* (internal quotations omitted).

With regard to the first inquiry, the Supreme Court has instructed that "[u]nder ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *TLO*, 469 U.S. at 341-42 (footnotes omitted).  "Since [*TLO*], the Supreme Court has established that school searches do not always need to be supported by individualized suspicion," and instead can be justified by "'special needs, beyond the normal need for law enforcement.'"  *Hough v. Shakopee Pub. Sch.*, 608 F. Supp. 2d

1087, 1097 (D. Minn. 2009) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (upholding school district's policy of subjecting student athletes to random, suspicionless drug tests)).

Here, the general project of school safety and avoiding large-scale fights between groups of students likely falls within the purpose of "maintain[ing] security and order" that the Supreme Court contemplated in *TLO*. *See TLO*, 469 U.S. at 340. But although Defendants repeatedly point to that goal as the justification for Barze's and Mills' meeting with Thomas, there is evidence in the record upon which a reasonable jury could find that was **not** the intent or justification behind Barze's and Mills' meeting. A jury could conclude, as Thomas testified, that Barze and Mills sought to detain Thomas because they felt disrespected by comments he made to them at the end of lunch time. But even if the jury found credible Mills' testimony that the purpose of the meeting was for mentoring, that is not a basis for a seizure, even under *TLO*, because a jury could find that Mills had no reason to believe that Thomas had violated any school rules or law. *See TLO*, 469 U.S. at 341-42 (search or seizure is justified at inception if there "are reasonable grounds for suspecting that the search will turn up evidence that the student **has violated or is violating either the law or the rules of the school**" (emphasis added)). Although Defendants argue that Thomas violated school rules by "[b]eing disorderly in the lunchroom and using disrespectful and threatening language toward staff," (Defs.' Mem. in Supp. of Mot. for Summ. J. at 15), Mills does not cite such supposed rule violations in his explanation for the meeting – either in his deposition or in Matlock's reports of Mills' explanation to him.

Defendants argue that a preemptive, mentoring-like meeting is justifiable if there are reasonable grounds to believe it could help to prevent a large fight. (*See id.* at 16); *see also Thompson v. Carthage Sch. Dist.*, 87 F.3d 979, 982-83 (8th Cir. 1996) (broad search for guns and knives involving instructions that children take off their shoes and socks and empty their pockets was permissible as a "generalized, but minimally intrusive search" in light of principal's "two independent reasons to suspect that one or more weapons had been brought to school that morning"). Even if it could be argued that a preemptive mentoring meeting is permissible under these circumstances, a jury need not necessarily believe Mills' testimony that the reason they pulled aside Thomas and Davis in particular is because they believed those students to have been inciting tension between black and Hmong students. There is no evidence in the record, other than Mills' testimony, of any such threats by Thomas. (*See* Mills Dep. 9-10.) A jury could reasonably find that Mills and Barze did not actually seek to meet with Thomas because they thought doing so would help minimize the possibility of a fight, but rather because, as Thomas suggests, they felt disrespected. Just as the Court must avoid "Monday morning quarterbacking" and not judge officers' or school officials' actions with the benefit of hindsight, *Shade*, 309 F.3d at 1061, the jury is not required to accept Defendants' now-coherent explanation that Mills and Barze sought to quell potential large-scale fights at the school.

Thus, the Court concludes that a reasonable jury could find that the first element of *TLO* is not satisfied in this case. Even assuming that the first element was satisfied, though, a jury could also conclude that the second element was not met because the

seizure was not reasonable in relation to its purported objective.  In particular, a jury could conclude that a mentoring meeting for the purpose of stemming potential future fights would not warrant a private meeting in an inner office between one student and two police officers, and also would not warrant a pat-down search by the officers once there and certainly not a choke hold.  Although the deposition testimony suggests that at some point the officers indicated that they saw a bulge in Thomas' pocket, which could ostensibly create a new justification for the pat-down, their testimony on that point is not consistent, such that it would be reasonable for a jury to not credit such an explanation.  Taking the facts in a light most favorable to Thomas, this "mentoring meeting" involved Barze injuring Thomas in a choke hold.  A jury could reasonably conclude that such a seizure was excessively intrusive in light of Barze's and Mills' purported mentoring objectives.  The Court therefore concludes that, even applying *TLO*'s relaxed standard, a reasonable jury could conclude that requiring Thomas to meet with them in a private office where he did not feel free to leave violated Thomas' rights under the Fourth Amendment.

### 4.    Qualified Immunity

Having determined that a reasonable jury could conclude that Barze and Mills violated Thomas' rights under the Fourth Amendment, the Court must also consider whether those rights were clearly established in order to assess Barze's and Mills' claims that they are entitled to qualified immunity.  "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a

clearly established constitutional or statutory right of which a reasonable person would have known." *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006).[6]  In order for the relevant rights to be clearly established, the exact act need not have been previously held unlawful, but the unlawfulness must have been apparent "in light of pre-existing law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1995).  The Court will thus consider whether a reasonable officer would have known that it would violate Thomas' Fourth Amendment rights to detain him in the SPAN office under the circumstances here.

There are two complications with this inquiry.  First, it is not clear whether the Court, in conducting this inquiry for qualified immunity purposes, must consider whether a reasonable officer would have anticipated her actions to be judged under *TLO*. Defendants argued as much during oral argument, so the Court will assume, out of an abundance of caution, that it must have been clearly established that Barze's and Mills' actions violated Thomas' rights even under the relaxed *TLO* standards.  Second, given that this inquiry first looks to the initial justification for the seizure, the inquiry is complicated by the wide array of justifications presented by the various deposition testimonies and the Court's conclusion that a reasonable jury could credit nearly any of

---

[6]  In considering an assertion of qualified immunity, the Court must address two questions: (1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional or statutory right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted.  *Henderson*, 439 F.3d at 501-02.  The Court has exercised its "discretion" to address the merits question before addressing whether the rights Thomas' claims were violated were clearly established at the time of the alleged violation.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

- 56 -

them.   The Eighth Circuit has provided some guidance on how to analyze qualified immunity at the summary judgment stage, where the facts may not be established or are disputed:

> Because qualified immunity is an immunity from suit rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial.  For this reason, qualified immunity cases are somewhat unique in that the court should not deny summary judgment any time a material issue of fact remains on the constitutional violation claim because to do so could undermine the goal of qualified immunity.  Indeed, the court must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them.  Then, on substantive review, we look at whether the official is entitled to qualified immunity based on the summary judgment facts as described by the district court.

*Jones v. McNeese*, 675 F.3d 1158, 1161-62 (8th Cir. 2012) (alterations, citations, and internal quotations omitted).  The Court therefore will take the evidence of potential justifications in a light most favorable to Thomas in order to analyze whether, based on those justifications, a reasonable officer should have known that the seizure was unlawful under *TLO*.

As discussed above, it would be reasonable for a jury to believe that Barze and Mills sought to meet with Thomas because they felt disrespected, and not because they thought doing so was necessary or would even be helpful in preempting violence at the school.  Such a rationale for the seizure would not be justified under *TLO*, and it is reasonable to expect a police officer working in a school to know as much.  Defendants present no argument or support to the contrary.  Rather, Defendants' argument is that case law establishes the propriety of law enforcement preemptively meeting with students

when there is a reasonable possibility of a large-scale fight at the school. (*See* Defs.'
Mem. in Supp. of Mot. for Summ. J at 19-20 (citing *Gray ex rel. Alexander v. Bostic*, 458
F.3d 1295, 1305 (11th Cir. 2006) (officer's stopping and questioning of student after
witnessing student verbally threaten her teacher was justified under first prong of *TLO*);
*Milligan*, 226 F.3d at 653 (officers meeting with and questioning students about potential
fight and warning them that "their parents would be called if a fight should occur" was
justified under first *TLO* prong where administration had received tip that fight with
weapons was imminent)).)  This argument ignores the Court's duty to take the facts in a
light most favorable to Thomas at this stage, which leads the Court to conclude that a jury
could reasonably decide not to credit Defendants' fight-prevention explanation
altogether.  However, even assuming that a jury credited the fight-prevention explanation,
the Court concludes that a reasonable officer should have known that the seizure – the
meeting in the SPAN office – was not "'reasonably related to the objectives of the search
and not excessively intrusive.'"  *Shade*, 309 F.3d at 1062 (quoting *TLO*, 469 U.S. at 342).
The officers should have known that a private meeting in an inner office which involved
a pat-down at some point was excessively intrusive if the purpose of the meeting was to
mentor Thomas or merely encourage him to not incite any potential fights.  Even Matlock
acknowledges that the "mentoring" meeting turned wrong quickly, and a reasonable jury
could conclude that the escalation was due to the officers', rather than Thomas', conduct.
If that were the case, a reasonable officer should have known that such a seizure, which
involved Thomas being placed into a choke hold, would not have been appropriate in
scope given the initial fight-prevention rationale for the meeting.  The Court therefore

concludes that summary judgment for Barze and Mills on Thomas' claims for excessive force and false arrest is not appropriate and that the officers are not entitled to qualified immunity.

### C.        Excessive Force Against Mills

Defendants also move to dismiss the excessive force claim against Mills, arguing that there is insufficient evidence to support a finding that he used excessive force against Thomas or was required, and failed, to intervene to stop Barze's use of force against Thomas.   Thomas' theory on this issue is that Mills had a duty to intervene to stop Barze's use of excessive force.

"[A] state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official." *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).  Thus, police officers have a duty to "intervene to prevent the excessive use of force – where the officer is aware of the abuse and the duration of the episode is sufficient to permit an inference of tacit collaboration." *Id.*  Defendants argue that Thomas' claim against Mills for failure to intervene must fail because there is no evidence that Mills knew what Barze was going to do or that he had time to stop it, such that Mills did not have the "duty, opportunity, or ability" to intervene.  *Lumsden v. Reichert*, Civ. No. 00-2463, 2003 WL 1610782, at *5 (D. Minn. Mar. 11, 2003).

The Court concludes that there are facts upon which a reasonable jury could find that Mills had an opportunity to intervene to stop Barze's alleged use of excessive force

against Thomas, but failed to do so in a manner that violated Thomas' constitutional rights.   This analysis is largely dependent upon the excessive force claim against Barze, which is not subject to this motion and for which Defendants acknowledge that the parties "wildly dispute" the facts.   But the Court concludes that, even given those uncertainties, there are facts in the record upon which a reasonable jury could conclude that Mills had the opportunity to stop Barze but failed to do so.

Defendants suggest that the required showing for such a claim requires a plaintiff to demonstrate **both** that a partner officer knew of the offending officer's intentions in advance **and** had enough time to intervene.   But these two elements effectively merge into whether or not the partner officer had an **opportunity** to intervene – if there is sufficient time to intervene effectively **after** the use of force has become apparent, it would be immaterial whether the partner officer knew of the other officer's intentions before the force began.   *See Krout*, 583 F.3d at 566 (finding that evidence supported a finding that defendants "violated [plaintiff]'s clearly established rights under the Fourth Amendment by failing to intervene when they had a duty and opportunity to do so").   Here, a jury would not have to accept Mills' and Barze's statement of the timeframe of the neck restraint.   Rather, under Thomas' version of the events, Thomas struggled with Barze under the choke hold for some time – enough time to kick over the boxes and wreak havoc in the office.   This is not a case like *Cherney v. City of Burnsville*, Civ. No. 06-4265, 2008 WL 108964 (D. Minn. Jan. 8, 2008), where the court observed that the relevant "search [was] undisputedly [] completed within a matter of seconds."   *Id.* at *8. Furthermore, there is testimony suggesting that one of them had time to say "night

night," and Thomas testified that Mills had time to say "put him to sleep."[7]   The Court does not suggest that Mills should have physically involved himself, but only that there is evidence supporting a finding that there was an opportunity to tell Barze to stop and remove the choke hold, and that he did not do so.

With regard to whether it was clearly established that not intervening would violate Thomas' constitutional rights, the Court concludes that any determination on whether intervention was warranted or necessary is contingent upon the jury's determination as to what was happening between Thomas and Barze, which is not yet determined.   Given that Defendants have not moved for summary judgment on the excessive force claim against Barze, the Court takes the facts surrounding the physical altercation in a light most favorable to Thomas and concludes that a reasonable officer should have known to intervene and stop another officer from putting a student in a neck restraint or choke hold where such restraint was unprovoked.   The Court therefore concludes that summary judgment on Thomas' excessive force claim against Mills is not warranted at this time and that Mills is not entitled to qualified immunity on this claim.

---

[7] Defendants make two arguments about Mills' supposed verbal communications during the choke hold: first, that to the extent Thomas points to statements he claims Mills made that encouraged Barze to further exert force upon Thomas in the choke hold, verbal encouragement is not actionable under the Fourth Amendment, and second, that any comments by Mills about putting him to sleep were for a legitimate law enforcement purpose – "to alert Barze that the neck restraint had been sufficiently effective." (Defs.' Mem. in Supp. Mot. for Summ. J. at 23.) The Court does not rely on the alleged "night night" or "sleep" comments in a way that offends these concerns – the Court does not treat such comments as actionable verbal encouragement. Rather, if a jury were to believe Mills made these statements, it would permit the jury to conclude that the **timing and opportunity** were adequate for Mills to intervene, because he had time to make the comments.  To the extent Defendants suggest that they **were** an attempt to stop Barze, that is a factual question for the jury to determine.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Partial Summary Judgment [Docket No. 21] is **DENIED**.

2.      Plaintiff's Motion to Exclude Expert Testimony [Docket No. 16] is **GRANTED**.  Defendants shall have **fourteen (14) days** from the entry of this order to file a modified version of the Lego's expert report.

**IT IS FURTHER HEREBY ORDERED** that plaintiff's voluntarily dismissal of his claims against the City of Minneapolis is **GRANTED** and those claims are **DISMISSED without prejudice.**

DATED:   September 30, 2014                    ____s/ John H. Tunheim____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                                   United States District Judge